STATE of Minnesota, Respondent,

v.

Dale Lee UNDERDAHL, Appellant,

Timothy Arlen Brunner, Appellant.

Nos. A07–2293, A07–2428.

Supreme Court of Minnesota.

April 30, 2009.

Rehearing Denied July 22, 2009.

Lori Swanson, Attorney General, St. Paul, Minnesota; and James C. Backstrom, Dakota County Attorney, Jessica Bierwerth and Helen Brosnahan, Assistant Dakota County Attorneys, Hastings, Minnesota, for respondent.

Jeffrey S. Sheridan, Strandemo, Sheridan & Dulas, P.A., Eagan, Minnesota, for appellant Dale Lee Underdahl.

Derek A. Patrin, Meaney & Patrin, P.A., Eden Prairie, Minnesota, for appellant Timothy Arlen Brunner.

## OPINION

MEYER, Justice.

Dale Lee Underdahl and Timothy Arlen Brunner (appellants) each sought discovery of the complete computer source code for the Minnesota model of the Intoxilyzer 5000EN in their separate driving while intoxicated (DWI) criminal prosecutions. The district courts in both cases ordered the State to produce the computer source code within 30 days, or the courts would dismiss certain charges and find that the breath test results were not admissible. The State appealed the discovery orders, and the court of appeals consolidated the actions and reversed both orders for production. *State v. Underdahl*, 749 N.W.2d 117, 121 (Minn.App.2008).

We granted appellants' petitions for review concerning the district courts' discovery orders, and also asked the parties to brief two additional issues: (a) whether the State is required to show critical impact, under Minn. R.Crim. P. 28.04, in its pretrial appeal of the district court discovery orders, and (b) whether the State has shown that the district courts' pretrial orders at issue in these cases will have a

critical impact on its ability to prosecute the defendants successfully. We answer both critical impact questions in the affirmative. Further, we affirm the court of appeals' decision to reverse the production order in appellant Underdahl's case. With respect to appellant Brunner, however, we reverse the court of appeals and reinstate the district court's order for State production of the complete computer source code for the Minnesota model of the Intoxilyzer 5000EN.

### State v. Underdahl

On February 18, 2006, Dale Lee Underdahl was stopped on suspicion of driving while intoxicated and was arrested after performing poorly on field sobriety tests and failing a preliminary breath test. Underdahl agreed to a breath test performed with the Intoxilyzer 5000EN, the most recently approved breath-test instrument for the State of Minnesota.[1] The Intoxilyzer 5000EN revealed an alcohol content of .23. Underdahl was charged in Dakota County District Court with third-degree driving while impaired (blood alcohol concentration of .20 or more), Minn.Stat. §§ 169A.20, subd. 1(5), 169A.26 (2008), and the complaint against him was later amended to include a charge of fourth-degree driving while impaired (under the influence of alcohol), Minn.Stat. §§ 169A.20, subd. 1(1), 169A.27.

Underdahl brought a motion for discovery, seeking State production of "a complete copy of the computer source and object codes for the Minnesota model of the Intoxilyzer 5000EN that was used to test the Defendant." The State opposed the motion, arguing that the source code was not relevant and not in the State's possession because the Intoxilyzer 5000EN's manufacturer, CMI, Inc., owned the source code. The district court granted the discovery request and ordered that a complete copy of the computer source code for the Minnesota model of the Intoxilyzer 5000EN be provided to Underdahl in 30 days, or any evidence of the Intoxilyzer 5000EN test would be excluded from the State's case and the charge of third-degree driving while impaired (.20 or more) would be dismissed.

### State v. Brunner

On July 28, 2007, Timothy Arlen Brunner was stopped on suspicion of driving while intoxicated. Brunner agreed to an Intoxilyzer 5000EN breath test. That test revealed an alcohol content of .18. Brunner was charged in Dakota County District Court with first-degree driving while impaired (under the influence of alcohol within 10 years of three or more qualified incidents), Minn.Stat. §§ 169A.20, subd. 1(1), 169A.24 first-degree driving while impaired (blood alcohol concentration of .08 or more), Minn.Stat. §§ 169A.20, subd. 1(5), 169A.24 and driving after cancellation of a driver's license, Minn.Stat. § 171.24, subd. 5 (2008).

Brunner brought a motion for discovery of the computer source code for the Minnesota model of the Intoxilyzer 5000EN. The district court granted the motion and ordered the State to produce the complete computer source code within 30 days, or the court would dismiss the

---

1. Between 1983 and 1997, law enforcement officials in Minnesota used the Intoxilyzer 5000, Series 64 and 66, to test drivers suspected of driving under the influence of alcohol. *Jasper v. Comm'r of Pub. Safety*, 642 N.W.2d 435, 437 (Minn.2002). In 1996, the State decided to replace its Intoxilyzer model with a new breath testing device and issued a request for proposal (RFP). *In re Comm'r of Pub. Safety*, 735 N.W.2d 706, 708 (Minn. 2007). CMI, Inc., submitted the winning bid with its Intoxilyzer 5000EN model, which the Commissioner of Public Safety subsequently approved for statewide use. *See* Minn. R. 7502.0420.

first-degree driving while impaired (over .08) charge and find that the test result was not admissible.

The State appealed the rulings of both district courts. The court of appeals consolidated the cases and reversed the district courts, concluding that Underdahl and Brunner had made "inadequate showings in the district court on the relevancy of the source code." *State v. Underdahl,* 749 N.W.2d 117, 121 (Minn.App.2008). The court of appeals did not analyze whether the State had shown critical impact under Minn. R.Crim. P. 28.04. We accepted appellants' petitions for review, and also asked the parties to address whether the State was required to show critical impact in its pretrial appeal, and whether the State could show critical impact in these cases.

## I.

■ We consider first whether the State was required to show critical impact in its pretrial appeal. Pretrial appeals by the State are governed by Minn. R.Crim. P. 28.04. We construe and interpret our rules of procedure de novo. *State v. Barrett,* 694 N.W.2d 783, 785 (Minn.2005).

Minnesota Rule of Criminal Procedure 28.04, subd. 1(1), provides: "The prosecuting attorney may appeal as of right to the Court of Appeals ... in any case, from any pretrial order of the trial court...." The procedure for such an appeal is set out in subdivision 2, and requires:

> The prosecuting attorney shall file with the clerk of the appellate courts a notice of appeal, a statement of the case ... which shall also include a summary statement by the prosecutor as to how the trial court's alleged error, unless reversed, will have a critical impact on the outcome of the trial....

Minn. R.Crim. P. 28.04, subd. 2(2). In *State v. Webber,* 262 N.W.2d 157, 159 (Minn.1977), we held that a pretrial order will only be reversed if the State "demonstrates clearly and unequivocally that the trial court has erred in its judgment and that, unless reversed, the error will have a critical impact on the outcome of the trial." The operation of Rule 28.04, subd. 2 was reinforced by our decision in *State v. Kim,* where we upheld the critical impact requirement as a "fair and workable rule." 398 N.W.2d 544, 551 (Minn.1987). The critical impact requirement has evolved into a "threshold issue," so that " 'in the absence of critical impact we will not review a pretrial order.' " *State v. McLeod,* 705 N.W.2d 776, 784 (Minn.2005) (quoting *In re Welfare of L.E.P.,* 594 N.W.2d 163, 168 (Minn.1999)); *see State v. Scott,* 584 N.W.2d 412, 416 (Minn.1998) (noting the change to the *Webber* decision's order of analysis to require critical impact to be determined before deciding whether the trial court erred).

In the notices of appeal in these cases, the State did not assert critical impact; instead, the State stated that "Minnesota Appellate Courts have held that the critical impact requirement does not apply to discovery orders on pretrial appeal." The State then cited to a Minnesota Court of Appeals decision that exempts nonsuppression orders from the critical impact requirement. *State v. Renneke,* 563 N.W.2d 335 (Minn.App.1997). In *Renneke,* the State appealed a district court order compelling disclosure of a deputy's personnel file. *Id.* at 337. The court of appeals concluded that the State did not have to show critical impact in a discovery dispute because the critical impact requirement "originally applied specifically to suppression orders." *Id.* (citing *State v. Solheim,* 477 N.W.2d 785, 786–87 (Minn. App.1991); *State v. Cain,* 427 N.W.2d 5, 9–10 (Minn.App.1988)). The court of appeals held that discovery orders are exempt

from the critical impact requirement, noting that rulings that directly impact the evidence admissible at trial can have a "critical impact" on the outcome of the trial, but this rationale does not extend to discovery orders. *Id.*

Recently, we cautioned that the court of appeals' rule in *Renneke* (exempting discovery orders from the critical impact requirement) has never been adopted by our court. *State v. Rambahal,* 751 N.W.2d 84, 89 (Minn.2008). We further noted that the *Renneke* rule "appear[ed] to be at odds with our prior cases and the plain language of Minn. R.Crim. P. 28.04," but we ultimately declined to rule on critical impact as the parties had not petitioned for review or briefed the issue. 751 N.W.2d at 89. We now hold that Minn. R.Crim. P. 28.04 requires the State to show critical impact in all pretrial appeals and there is no exception for an appeal from a discovery order. Our explanation follows.

 We look first to the plain language of the rule. *Rubey v. Vannett,* 714 N.W.2d 417, 421 (Minn.2006). Plain and unambiguous language must be followed. *State v. Dahlin,* 753 N.W.2d 300, 305 (Minn.2008). The rule must be read as a whole and each section interpreted " 'in light of the surrounding sections to avoid conflicting interpretations.' " *Id.* at 306 (quoting *Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 277 (Minn. 2000)).

Minnesota Rule of Criminal Procedure 28.04, subd. 1, allows the State to appeal from any pretrial order, while subdivision 2 requires these appeals to include a statement on "how the trial court's alleged error, unless reversed, will have a critical impact on the outcome of the trial." This language does not differentiate between suppression orders and discovery orders; the rule plainly requires all pretrial appeals to be accompanied by a statement of critical impact.

We have applied the plain language of the critical impact rule to discovery and nonsuppression orders in at least two decisions. In *State v. Hejl,* the State appealed a district court order to produce the transcript of grand jury proceedings to a defendant. 315 N.W.2d 592, 592 (Minn. 1982). We held that the State failed to demonstrate that an error in the order would have a critical impact on the defendant's prosecution. *Id.* at 593. In *State v. Barsness,* the district court ruled that evidence of a defendant's IQ was admissible, a ruling that the court of appeals reversed. 473 N.W.2d 828, 828 (Minn.1990). We said that the court's pretrial evidentiary ruling could only be reversed if the State demonstrated the court had erred and that the error would have critical impact. We held that the State had not established critical impact. *Id.*

While not central to our decision, the rule we affirm today fulfills the original purpose behind Minn. R.Crim. P. 28.04. Historically, appeals by the government in criminal cases were " 'unusual, exceptional, not favored.' " *Arizona v. Manypenny,* 451 U.S. 232, 245, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981) (quoting *Will v. United States,* 389 U.S. 90, 96, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967)). To ensure individuals were free from harassing litigation by the State, the government traditionally had no authority to appeal without express legislative authorization. *See United States v. Sanges,* 144 U.S. 310, 315, 318, 12 S.Ct. 609, 36 L.Ed. 445 (1892). Minnesota did not allow prosecutorial appeals until 1967, when statutes were enacted that gave the State a limited right to pretrial appeal and formed the basis for the critical impact requirement. *See* Minn.Stat.

§§ 632.11, 632.12 (1967) (repealed 1979).[2] In 1975, the Minnesota Rules of Criminal Procedure superseded these statutes;[3] the rules broadened the scope of appealable pretrial orders, but still required a showing of critical impact. *See* Minn. R.Crim. P. 23.08 (1975) (current version at Minn. R.Crim. P. 28.04). We continued to recognize that the rules on government pretrial appeals must be strictly construed, as the appeal could occur as "the defendant is awaiting trial, presumed innocent, and possibly confined." *State v. Barrett*, 694 N.W.2d 783, 787 (Minn.2005).

We turn to the question of whether the State has demonstrated critical impact in the two cases before us. When the State appeals a pretrial order, it must show clearly and unequivocally (1) that the district court's ruling was erroneous and (2) that the ruling will have a "critical impact" on the State's ability to prosecute the case. *State v. McLeod*, 705 N.W.2d 776, 784 (Minn.2005). Critical impact, the threshold question, is intended to be a "'demanding standard,'" but with some flexibility. *Id.* (quoting *State v. Zanter*, 535 N.W.2d 624, 630 (Minn.1995)). The State can show critical impact when complying with an order "significantly reduces the likelihood of a successful prosecution." *Id.* (citing *Kim*, 398 N.W.2d at 551). The State does not have to show that conviction is impossible after the pretrial order—only that the prosecution's likelihood of success is seriously jeopardized. *In re L.E.P.*, 594 N.W.2d at 168.

When examining critical impact, the State's admissible evidence will be viewed as a whole to determine what impact the pretrial order will have on the prosecution's case. *Id.* Evidence unique in nature and quality is more likely to satisfy the critical impact requirement. *Id.*

The State argues that the discovery orders requiring production of the Intoxilyzer code will have a critical impact on the prosecution because the orders exclude the Intoxilyzer test results from trial if the source code is not produced. The State argues that if the test results are excluded, charges against both appellants will be dismissed because Underdahl's charge of third-degree driving while impaired (.20 or more) and Brunner's charge of first-degree driving while impaired (over .08) are based on the test results. *See* Minn.Stat. § 169A.20, subd. 1(5). The State also claims it would lose important evidence in the remaining DWI charges. Appellants argue that suppression of the test results will not have critical impact, because the State can still successfully prosecute appellants on the charges that would remain in both cases. *See* Minn.Stat. §§ 169A.20, subd. 1(1), 171.24, subd. 5.

We agree with the State that the pretrial orders will have a critical impact on the State's ability to successfully prosecute these cases. Although we have never before held that a discovery order can have critical impact, *see Hejl*, 315 N.W.2d at 593, these orders keep the Intoxilyzer test results from coming into evidence if

---

**2.** Minnesota Statutes § 632.11 authorized the State to appeal pretrial suppression orders, if the appeal met the requirements of section 632.12. The latter section required a statement on how the suppression order made the prosecution's evidence (1) insufficient as a matter of law or (2) so weak that any possibility of getting a conviction was effectively destroyed. *Id.* § 632.12.

**3.** In 1974, this court was authorized to promulgate criminal procedural rules, which were to immediately supersede any inconsistent statutes. Act of Apr. 9, 1974, ch. 390, § 1, 1974 Minn. Laws 697, 697–98.

the State does not comply with the discovery orders. In addition, an order that dismisses DWI charges, even when other charges remain, will have a critical impact on the prosecution's case. *See State v. Hicks,* 301 Minn. 350, 353, 222 N.W.2d 345, 347 (1974). In *Hicks,* a pretrial order suppressed the results of a blood alcohol test in criminal charges of driving while under the influence and driving with .10 percent or more blood alcohol content. *Id.* at 351–52, 222 N.W.2d at 347. The prosecution was required to meet our previous standard set forth in Minn.Stat. § 632.11 (1974), which required the prosecutor to show that the order " 'effectively prevented the chance of a successful prosecution.' " 301 Minn. at 352, 222 N.W.2d at 347 (citation omitted). We held the pretrial order prevented the chance of successful prosecution of the driving with .10 percent or more blood alcohol content, so the order was appealable. *Id.* at 353, 222 N.W.2d at 347.

*State v. Hicks* controls our conclusion here. The pretrial orders would suppress the breath tests and expressly dismiss certain charges as a result of nonproduction, keeping the State from being able to prosecute those charges at all. Further, the breath test results cannot be duplicated by other evidence. We therefore hold the district court discovery orders meet the critical impact test because the exclusion of the breath test results will significantly reduce the likelihood of a successful prosecution on a charged offense.

## II.

We next turn to whether the district courts abused their discretion in concluding that the computer source code was relevant and otherwise discoverable under Minn. R.Crim. P. 9.01, subd. 2. Rule 9 of the Minnesota Rules of Criminal Procedure governs discovery in criminal cases.

Rule 9.01, subd. 1, describes what must be disclosed by the prosecution without a court order. Rule 9.01, subd. 2, details the circumstances under which the court may use its discretion in ordering additional discovery. In relevant part, Rule 9.01, subd. 2(3), states:

> Upon motion of the defendant, the trial court at any time before trial may, in its discretion, require the prosecuting attorney to disclose to defense counsel and to permit the inspection, reproduction or testing of any *relevant* material and information not subject to disclosure without order of court under Rule 9.01, subd. 1, provided, however, a *showing is made that the information may relate to the guilt or innocence of the defendant* or negate guilt or reduce the culpability of the defendant as to the offense charged.

Minn. R.Crim. P. 9.01, subd. 2(3) (emphasis added).

A district court judge has " 'wide discretion to issue discovery orders,' " and normally an order will not be overturned without clear abuse of that discretion. *In re Comm'r of Pub. Safety (Underdahl I),* 735 N.W.2d 706, 711 (Minn. 2007) (quoting *Shetka v. Kueppers,* 454 N.W.2d 916, 921 (Minn.1990)). To find an abuse of discretion, an appellate court must conclude that the district court erred by making findings unsupported by the evidence or by improperly applying the law. *Id.*

We have not previously stated what showing is required to support a district court's conclusion that information may relate to a defendant's guilt or innocence in a DWI case. But we have described that showing in cases where the defendant has requested to review confidential information. In those cases, we have required "some plausible showing that the information sought would be both material and favorable to his defense." *State v. Hum-*

*mel,* 483 N.W.2d 68, 72 (Minn.1992) (citation omitted) (internal quotation marks omitted); *accord State v. Evans,* 756 N.W.2d 854, 872–73 (Minn.2008). In *Hummel,* we overturned the district court's discovery order of a confidential file because the defense offered no theories on how the file "could be related to the defense or why the file was reasonably likely to contain information related to the case." 483 N.W.2d at 72.

■■■ In his discovery motion, appellant Underdahl requested a copy of the Intoxilyzer source code or the exclusion of the breath test result if the State failed to produce the source code. Underdahl's motion contained no other information or supporting exhibits related to the source code. At an omnibus hearing on October 17, 2007, Underdahl argued that a jury in a DWI case is asked to determine whether a breath test result is valid, and the only way for Underdahl to challenge that validity "is to go after the testing method itself."[4] The district court found that the jury instructions in a DWI case require the jury to evaluate the reliability of the testing method in determining the blood alcohol concentration level. Because the Intoxilyzer 5000EN provides the only evidence of alcohol concentration, the court found that evidence regarding the operation of that instrument is relevant.

■■■ Appellant Brunner submitted a memorandum and nine exhibits to support his request for the source code. The memorandum gave various definitions of "source code." The first exhibit was the written testimony of David Wagner, a computer science professor at the University of California in Berkeley, which ex-plained the source code in voting machines, the source code's importance in finding defects and problems in those machines, and the issues surrounding the source code's disclosure. The next exhibits detailed Brunner's attempts to obtain the source code, both from the State and CMI. The last exhibit was a copy of a report prepared on behalf of the defendants in New Jersey litigation about the reliability of New Jersey's breath-test machine. *See State v. Chun,* 194 N.J. 54, 943 A.2d 114 (2008). The report analyzed the New Jersey machine's computer source code and uncovered a variety of defects that could impact the test result. Based on Brunner's evidence, the district court found that the integrity of the source code is essential to the scientific reliability of the Intoxilyzer 5000EN test result. Further, the jury instructions asked the jurors to assess the reliability of the testing method, which could not be done without Brunner having access to the software controlling that testing process.

Although broad discretion is given to district courts in discovery matters, the district court in appellant Underdahl's case abused its discretion in finding the source code relevant and related to his guilt or innocence. Underdahl made no threshold evidentiary showing whatsoever; while he argued that challenging the validity of the Intoxilyzer was the only way for him to dispute the charges against him, he failed to demonstrate how the source code would help him do so. As in *Hummel,* Underdahl advanced no theories on how the source code "could be related to [his] defense or why the [source code] was reasonably likely to contain information related to the case." 483 N.W.2d at 72.[5] We hold

---

4. The Intoxilyzer 5000EN is statutorily presumed reliable, but Minnesota law permits this presumption to be challenged by drivers charged with DWI-related offenses. Minn.

Stat. §§ 634.16 (2008), 169A.53, subd. 3(b)(10) (2008).

5. The concurrence and dissent notes that when the district court in Underdahl's case

that, even under a lenient showing requirement, Underdahl failed to make a showing that the source code may relate to his guilt or innocence.

Brunner submitted source code definitions, written testimony of a computer science professor that explained issues surrounding the source codes and their disclosure, and an example of a breath-test machine analysis and its potential defects. Brunner's submissions show that an analysis of the source code may reveal deficiencies that could challenge the reliability of the Intoxilyzer and, in turn, would relate to Brunner's guilt or innocence. Therefore, we hold that the district court in Brunner's case did not abuse its discretion in concluding that the source code may relate to his guilt or innocence.

### III.

◾ We next determine whether the district courts' findings that the State had possession or control of the source code were clearly erroneous. The court of appeals did not reach this issue because it reversed both district courts' discovery orders based on the grounds of relevance. Minnesota Rule of Criminal Procedure 9.01, subd. 2(1), requires prosecuting attor-

neys to assist the defendant in seeking access to matters that are within the "possession or control" of the State. Both district courts found that the State is the owner of the source code for the Minnesota model of the Intoxilyzer 5000EN, relying on the request for proposal (RFP) issued by the State when replacing the previous version of its breath-test instrument.[6] The State argues that the district courts erred; it asserts that our holding in *Underdahl I* is distinguishable because the *Underdahl I* court was reviewing this question under the higher threshold of a writ of prohibition, and further contends that the RFP actually gives appellants, not the State, the right to access the source code.

In *Underdahl I*, the State had been ordered to produce the source code in appellant Underdahl's implied consent hearing. 735 N.W.2d at 709. The Commissioner of Public Safety petitioned the court of appeals for a writ of prohibition to prevent the district court from enforcing the order, a writ that can be issued if the mandated discovery "is clearly not discoverable and for which there is no adequate remedy at law." *Id.* at 711. We concluded that the Commissioner had failed to meet his burden of demonstrating that the

ordered discovery of the source code, the court relied on our decision in *Underdahl I.* The issue in *Underdahl I* was whether the Commissioner of Public Safety was entitled to a writ of prohibition to prevent the district court from enforcing its order that the State turn over the source code. 735 N.W.2d at 708. The narrow question in *Underdahl I* was whether the State had possession of the source code, not whether the defendant had established that the source code could be related to his defense or why the source code was reasonably likely to contain information related to the case. *Id.* at 709. We determined that the State was not entitled to a writ of prohibition to prevent the district court from enforcing its order that the State turn over the Intoxilyzer 5000EN source code. *Id.*

at 713. The narrow ground for our decision was that the Commissioner failed to prove the source code was "clearly not discoverable" based on the fact that the Commissioner had an agreement with the Intoxilyzer 5000EN's manufacturer, enforcement of which gave the Commissioner access to the code. *Id.* at 712. We never reached the question in the instant case: whether Underdahl has met his burden of showing that the source code is relevant and may relate to his guilt or innocence.

**6.** One provision of the RFP, titled "ownership of copyright," states that any copyrightable material would "be the property of the State and are by this Contract assigned to the State." *Underdahl I*, 735 N.W.2d at 708.

source code was "clearly not discoverable" because the source code was in "possession, custody or control" of the State; the Commissioner had conceded that the State owned some of the source code, a concession supported by the express copyright language in the RFP. *Id.* at 712.

We similarly conclude that the district courts did not abuse their discretion in finding the State had possession or control of the source code under Minn. R.Crim. P. 9.01, subd. 2(1). The RFP language cited by the district courts supports their conclusions that the State had possession of the source code. The State's arguments that appellants have access to the source code are also unpersuasive, because Rule 9.01, subd. 2(1), only speaks to the State's obligation to assist a defendant in seeking access to material the State possesses, aside from the defendant's possible access. We therefore hold that it was not an abuse of discretion for the district courts to find that the source code was in the possession or control of the State.[7]

In appellant Underdahl's case, we affirm the court of appeals and reverse the production order in his case. With respect to appellant Brunner, however, we reverse the court of appeals and reinstate the district court's order for State production of the complete computer source code for the Minnesota model of the Intoxilyzer 5000EN.

Affirmed in part, reversed in part, and remanded.

Concurring in part, dissenting in part, PAGE and ANDERSON, PAUL H., JJ.

PAGE, Justice (concurring in part and dissenting in part).

I concur in the result reached by the court with respect to appellant Brunner. But I respectfully dissent in the result with respect to appellant Underdahl.

Under our Rules of Criminal Procedure, a defendant has "wide latitude in requesting and receiving discovery, and district courts are afforded broad discretion to make discovery rulings." *State v. Burrell,* 697 N.W.2d 579, 604 (Minn.2005). When reviewing a district court's discovery order, our role is solely to determine whether the district court clearly abused its discretion by making "findings unsupported by the evidence or by improperly applying the law." *In re Comm'r of Pub. Safety (Underdahl I),* 735 N.W.2d 706, 711 (Minn. 2007). The district court found that, "[b]ecause the testing method is something that the jury will ultimately have to consider and because the computer source code is relevant to that testing method, the source code directly relates to the guilt or innocence of Defendant. Accordingly, the source code is discoverable."

Under Minn. R.Crim. P. 9.01, subd. 2(3), a trial court may order, in its discretion, the disclosure of "any relevant material . . . provided, however, a showing is made that the information may relate to the guilt or innocence of the defendant or negate guilt or reduce the culpability of the defendant as to the offense charged." Thus, in order to be discoverable in this case, the source code must be relevant, and must relate to Underdahl's guilt or innocence. The language of this rule comes from the ABA Standards, which provide that a judge may order disclosure of information

---

**7.** At the time of oral arguments, the State and CMI were working toward a settlement to give DWI defendants access to the source code after the State sued CMI on the basis that the State has property rights to the source code. We grant the State's Rule 127 motion to supplement its brief with the Mutual Release and Settlement Agreement in the federal litigation of *State of Minnesota, by Michael Campion, its Commissioner of Public Safety v. CMI of Kentucky, Inc., a Kentucky Corporation,* No. 08–CV–603 (D.Minn.2008).

"[u]pon a showing that items . . . are material to the preparation of the case." ABA Standards for Criminal Justice: Discovery and Trial by Jury Standard 11–4.3(e) (3d ed. 1996); *see also* Minn. R.Crim. P. 9 cmt.

The court today places a heavier burden on Underdahl than Rule 9.01, subd. 2(3), requires. The court requires Underdahl to show that the "source code 'could be related to [his] *defense* or why the [source code] was *reasonably likely* to contain information related to the case.'" (Emphasis added.) (Quoting *State v. Hummel*, 483 N.W.2d 68, 72 (Minn.1992).) But under Rule 9.01, subd. 2(3), Underdahl only had to make a showing that the information requested "may relate to [his] guilt or innocence."

In this case, guilt or innocence depends on Underdahl's blood alcohol content. His blood alcohol content is assessed by the Intoxilyzer 5000EN. The source code of the Intoxilyzer 5000EN is the programming instruction used by the machine to assess blood alcohol content. The operation of the source code determines the reliability of the Intoxilyzer 5000EN's blood alcohol content readings. The reliability of the Intoxilyzer 5000EN is a question that the jury will have to decide before determining Underdahl's

guilt or innocence. Thus, I conclude that the source code relates to Underdahl's guilt or innocence and that, under Rule 9.01, subd. 2(3), its disclosure is required.[1]

ANDERSON, Paul H., Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Page.

---

1. I note that a district court has already granted Underdahl discovery of "the complete computer source code for the operation of the [Intoxilyzer 5000EN]" in his implied consent case. *Underdahl I*, 735 N.W.2d at 708. In order to be discoverable, the source code must have been "'relevant to a claim or defense of any party'" and "'reasonably calculated to lead to the discovery of admissible evidence.'" *Id.* at 712 (quoting Minn. R. Civ. P. 26.02(a)). We affirmed the court of appeals' denial of a writ of prohibition sought by the State to prevent the district court from enforcing its order. *Id.* at 708. We concluded that the Commissioner of Public Safety "failed to meet his burden of demonstrating that the [source code being] sought is clearly not discoverable." *Id.* at 712.

At the omnibus hearing in this case, Underdahl presented our decision in *Underdahl I* to the district court. While *Underdahl I* does not dictate the district court's decision in this case, I conclude that, because the district court knew that discovery of the source code had been ordered in Underdahl's implied consent proceeding, the district court did not abuse its discretion when it ordered disclosure in this criminal proceeding. The court's decision today greatly infringes upon the district court's broad discretion to make discovery rulings. Further, I believe it is anomalous that Underdahl is entitled to have access to the source code when his right to drive is at stake, but he is denied access to that same source code when his right to liberty is threatened.